1   WARD KEENAN & BARRETT PC
    MICHAEL J. KEENAN
2   GERALD BARRETT
3   3838 N Central Avenue, Suite 1720
    Phoenix, AZ 85012
4   Telephone: (602) 279-1717

5
    ROBBINS UMEDA LLP
6   BRIAN J. ROBBINS
    GEORGE C. AGUILAR
7   DANIEL R. FORDE
8   600 B Street, Suite 1900
    San Diego, CA  92101
9   Telephone: (619) 525-3990
    Facsimile:  (619) 525-3991
10

11  Attorneys for Plaintiff

12  [Additional Counsel on Signature Page]

13                  UNITED STATES DISTRICT COURT
14                       DISTRICT OF ARIZONA

15  THEODORE C. KLATT, Derivatively On   ) Case No.
16  Behalf of MATRIXX INITIATIVES, INC.; )
                                          ) VERIFIED SHAREHOLDER DERIVATIVE
17                 Plaintiff,             ) COMPLAINT FOR BREACH OF
                                          ) FIDUCIARY DUTY, WASTE OF
18          vs.                           ) CORPORATE ASSETS, UNJUST
                                          ) ENRICHMENT AND VIOLATIONS OF
19  WILLIAM J. HEMELT, SAMUEL C.          ) §10(b) AND RULE 10b-5 OF THE
20  COWLEY, TIMOTHY L. CLAROT, JAMES )     SECURITIES EXCHANGE ACT OF 1934
    A. MARINI, LORI H. BUSH, JOHN M.      )
21  CLAYTON, WILLIAM C. EGAN, L.          )
    WHITE MATTHEWS, III, MICHAEL A.       )
22  ZEHER, AND CARL J. JOHNSON;           )
                                          )
23                 Defendants,            )
24          -and-                         )
                                          )
25  MATRIXX INITIATIVES, INC., a Delaware )
26  corporation,                          )
                                          )
27                 Nominal Defendant.)
28  _____)

                    VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff, by his attorneys, submits this Verified Shareholder Derivative Complaint against the defendants named herein.

## NATURE AND SUMMARY OF THE ACTION

1. This is a shareholder derivative action brought by a shareholder of Matrixx Initiatives, Inc. ("Matrixx" or the "Company") on behalf of the Company against certain of its officers and directors seeking to remedy defendants' violations of state and federal law, including breaches of fiduciary duties, waste of corporate assets, unjust enrichment and violations of the Securities Exchange Act of 1934 (the "Exchange Act") that occurred between December 22, 2007 and the present (the "Relevant Period") that have caused substantial monetary losses to Matrixx and other damages, such as to its reputation and goodwill.

2. Matrixx engages in the development, production, marketing, and sale of over-the-counter ("OTC") healthcare products. Matrixx's revenue is primarily generated from the Company's line of Zicam LLC ("Zicam") products. Zicam is a wholly owned subsidiary of Matrixx. Zicam produces a line of OTC products for colds, allergy relief congestion, and other illnesses.

3. Zicam Cold Remedy Nasal Gel was introduced in 1999. In 2002, the Company introduced Zicam Code Remedy Gel Swabs. Zicam also sold Zicam Cold Remedy Swabs, Kids Size during the Relevant Period. These products are collectively referred to herein as the "Intranasal Products."

4. The Zicam Intranasal Products contain zinc gluconate, which the Company claims shortens and prevents the duration of the common cold. However, dating back to the 1930s there is evidence that zinc gluconate can cause anosmia when administered intranasally.

5. During the Relevant Period, Defendants embarked upon a course of deception by failing to disclose to Matrixx's customers and the U.S. Food and Drug Administration ("FDA") the risk of loss of smell by users of their Zicam Intranasal Products.

6.     Anosmia is the brief or permanent loss of smell.   Shortly after the introduction of the Intranasal Products, complaints of anosmia after using the Intranasal Product developed.   The Company and the FDA received these consumer complaints regarding anosmia.   Matrixx, however, vehemently denied that the Intranasal Products caused anosmia and claimed it had undertaken testing to prove the claims of anosmia triggered by the Intranasal Products were false.   However, on January 19, 2006, Matrixx agreed to pay $12 million to settle a consolidated product liability lawsuit in Arizona, alleging that its Intranasal Products caused anosmia.   Moreover, there are dozens of other personal injury and product liability suits pending against Matrixx related to the Intranasal Products manufactured and sold by Zicam.

7.     On June 16, 2009, Zicam received a Warning Letter from the FDA regarding the Intranasal Products.   Matrixx stock value dropped 70% upon the announcement.   In response, the Company pulled the Intranasal Products from store shelves.   In addition to having to respond to the FDA Warning Letter, the Company must use funds to defend (and potentially settle or pay out) dozens of personal injury lawsuits and a securities fraud class action lawsuit, costs of future FDA compliance, $10 million from the recall of Intranasal Products and an informal inquiry by the U. S. Securities and Exchange Commission ("SEC").    Furthermore, while the defendants were causing the Company to violate FDA regulations, certain of the Company's officers and directors were causing the Company to spend nearly $15 million to buy its own artificially inflated stock while they were selling $3.4 million of their personally held stock.

**JURISDICTION AND VENUE**

8.     This Court has jurisdiction in this case arising under Article III of the United States Constitution and 28 U.S.C. §1331 because of claims arising under the Exchange Act.   This Court also has jurisdiction over all causes of action asserted herein pursuant to 28 U.S.C. §1332(a)(2) in that plaintiff and defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs. This Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a) over all other

- 2 -

claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

9.    This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

10.    Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because: (i) Matrixx maintains its principal place of business in the District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Matrixx, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

11.    Plaintiff Theodore C. Klatt is and has been shareholder of Matrixx since 2001 which encompasses the time of the transactions complained of herein.  Plaintiff is a resident of Washington.

12.    Nominal defendant Matrixx is a Delaware corporation with its principal executive offices located at 8515 E. Anderson Drive, Scottsdale, Arizona.  Matrixx engages in the development, production, marketing, and sale of OTC healthcare products.

13.    Defendant William J. Hemelt ("Hemelt") is Matrixx's President, Chief Executive Officer ("CEO") and a director and has been since August 2009.  Hemelt was also Matrixx's Acting President and Chief Operating Officer from October 2008 to August 2009; Chief Financial Officer from June 1998 to August 2009; Treasurer from

June 1998 to July 2007; Secretary from June 1998 to February 2005; and Executive Vice President, Operations from 2001 to about October 2008. During the Relevant Period, Hemelt, in breach of his fiduciary duties did not comply with the Company's Code of Ethics and failed to cause the Company to report serious adverse events to the FDA as detailed herein. Matrixx paid Hemelt the following compensation:

| Fiscal Year | Salary | Bonus | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation |
|---|---|---|---|---|---|
| 2009 | $325,384 | $61,800 | $190,911 | $245,347 | $9,641 |
| 2008 | $260,400 | - | $108,166 | - | $9,403 |
| 2007 | $60,092 | - | $23,528 | - | $2,502 |

Additionally, Hemelt misappropriated material non-public information regarding Matrixx's Zicam Intranasal Product issues and sold 21,724 shares of Matrixx stock for $379,541.25 while in possession of that material non-public information. Defendant Hemelt is a citizen of Arizona.

14.     Defendant Samuel C. Cowley ("Cowley") is Matrixx's Executive Vice President, Business Development, General Counsel, and Secretary and has been since May 2008 and a director and has been since July 2005. Cowley was also a member of the Audit Committee from at least 2007 to May 2008. During the Relevant Period, Cowley, in breach of his fiduciary duties did not comply with the Company's Code of Ethics and failed to cause the Company to report serious adverse events to the FDA as detailed herein. Matrixx paid Cowley the following compensation:

| Fiscal Year | Salary | Bonus | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation |
|---|---|---|---|---|---|
| 2009 | $226,769 | $166,800 | $349,895 | $198,320 | $6,597 |

Additionally, Cowley misappropriated material non-public information regarding Matrixx's Zicam Intranasal Product issues and sold 8,559 shares of Matrixx stock for $128,020.75 while in possession of that material non-public information. Defendant Cowley is a citizen of Arizona.

15.   Defendant Timothy L. Clarot ("Clarot") is Matrixx's Vice President, Research and Development and has been since January 2004. Clarot was also Matrixx's Director, Research and Development from June 2003 to January 2004; Director of Operations from 2001 to June 2003; and served in various other positions from 1999 to 2001. During the Relevant Period, Clarot, in breach of his fiduciary duties did not comply with the Company's Code of Ethics and failed to cause the Company to report serious adverse events to the FDA as detailed herein. Matrixx paid Clarot the following compensation:

| Fiscal Year | Salary | Bonus | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation |
|---|---|---|---|---|---|
| 2009 | $232,192 | $61,800 | $163,517 | $128,982 | $7,142 |
| 2008 | $223,400 | - | $92,506 | - | $8,936 |
| 2007 | $51,554 | - | $20,062 | - | $2,062 |

Additionally, Clarot misappropriated material non-public information regarding Matrixx's Zicam Intranasal Product issues and sold 105,907 shares of Matrixx stock for $1,957,798.78 while in possession of that material non-public information. Defendant Clarot is a citizen of Arizona.

16.   Defendant James A. Marini ("Marini") is Matrixx's Vice President of Sales and has been since January 2004. Marini was also Matrixx's National Sales Manager from July 1997 to January 2004. During the Relevant Period, Marini, in breach of his fiduciary duties did not comply with the Company's Code of Ethics and failed to cause the Company to report serious adverse events to the FDA as detailed herein. Matrixx paid Marini the following compensation:

| Fiscal Year | Salary | Bonus | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation |
|---|---|---|---|---|---|
| 2009 | $228,404 | $61,800 | $137,660 | $127,650 | $6,916 |
| 2008 | $160,840 | - | $67,381 | $20,882 | $7,269 |
| 2007 | $37,117 | - | $14,774 | $16,800 | $1,485 |

Additionally, Marini misappropriated material non-public information regarding Matrixx's Intranasal Product issues and sold 31,941 shares of Matrixx stock for $566,868.15 while in possession of that material non-public information. Defendant Marini is a citizen of Arizona.

17. Defendant Lori H. Bush ("Bush") is a Matrixx director and has been since October 2004. Bush is also Chairman of Matrixx's Compensation Committee and has been since at least March 2007 and a member of the Audit Committee and has been since 2008. Additionally, Bush misappropriated material non-public information regarding Matrixx's Zicam Intranasal Product issues and sold 14,000 shares of Matrixx stock for $253,100 while in possession of that material non-public information. During the Relevant Period, Bush, in breach of her fiduciary duties did not comply with the Company's Code of Ethics and failed to cause the Company to report serious adverse events to the FDA as detailed herein. Defendant Bush is a citizen of Utah.

18. Defendant Michael A. Zeher ("Zeher") is a Matrixx director and has been since September 2000. Zeher is also a member of Matrixx's Compensation Committee and has been since at least March 2007. During the Relevant Period, Zeher, in breach of his fiduciary duties did not comply with the Company's Code of Ethics and failed to cause the Company to report serious adverse events to the FDA as detailed herein. Defendant Zeher is a citizen of New York.

19. Defendant William C. Egan ("Egan") is Matrixx's Chairman of the Board of Directors (the "Board") and has been since August 2008 and a director and has been since August 2001. Egan is also a member of Matrixx's Audit Committee and has been since 2009. Egan was a member of Matrixx's Compensation Committee from at least March 2007 to 2008. During the Relevant Period, Egan, in breach of his fiduciary duties did not comply with the Company's Code of Ethics and failed to cause the Company to report serious adverse events to the FDA as detailed herein. Defendant Egan is a citizen of New Jersey.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

20.     Defendant L. White Matthews, III ("Matthews") is a Matrixx director and has been since March 2003.  Matthews is also Chairman of Matrixx's Audit Committee and has been since at least March 2007 and a member of the Compensation Committee and has been since at least March 2007. During the Relevant Period, Matthews, in breach of his fiduciary duties did not comply with the Company's Code of Ethics and failed to cause the Company to report serious adverse events to the FDA as detailed herein. Defendant Matthews is a citizen of Wyoming.

21.     Defendant John M. Clayton ("Clayton") is a Matrixx director and has been since October 2005.  Clayton is also a member of Matrixx's Compensation Committee and has been since at least March 2007 and a member of the Audit Committee and has been since 2009. During the Relevant Period, Clayton, in breach of his fiduciary duties did not comply with the Company's Code of Ethics and failed to cause the Company to report serious adverse events to the FDA as detailed herein.  Defendant Clayton is a citizen of Tennessee.

22.     Defendant Carl J. Johnson ("Johnson") was Matrixx's President and CEO from July 2001 to October 2008 and a director from July 2001 to December 2008. Johnson also served as an advisor to Matrixx from November 2008 to March 2009. During the Relevant Period, Johnson, in breach of his fiduciary duties did not comply with the Company's Code of Ethics and failed to cause the Company to report serious adverse events to the FDA as detailed herein.  Matrixx  paid Johnson the following compensation:

| Fiscal Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation |
|---|---|---|---|---|
| 2009 | $397,500 | $110,725 | $305,156 | $279,190 |
| 2008 | $500,000 | $246,903 | - | $10,193 |
| 2007 | $115,385 | $61,811 | - | $4,907 |

Additionally, Johnson misappropriated material non-public information regarding Matrixx's Zicam Intranasal Product issues and sold 10,375 shares of Matrixx stock for

1   $143,435.40 while in possession of that material non-public information.   Defendant
2   Johnson is a citizen of Arizona.

3           23.     The defendants identified in ¶¶13-14, 17-22 are referred to herein as the
4   "Director Defendants."  The defendants identified in ¶¶13-16, 22 are referred to herein as
5   the "Officer Defendants."    Collectively, the Director Defendants and the Officer
6   Defendants are referred to herein as the "Individual Defendants".

7           24.     The defendants identified in ¶¶13-17 are referred to herein as the "Insider
8   Selling Defendants."

9                          **DUTIES OF THE INDIVIDUAL DEFENDANTS**

10          25.     By reason of their positions as officers, directors, and/or fiduciaries of
11   Matrixx and because of their ability to control the business and corporate affairs of
12   Matrixx, the Individual Defendants owed and owe Matrixx and its shareholders fiduciary
13   obligations of trust, loyalty, good faith, and due care, and were and are required to use
14   their utmost ability to control and manage Matrixx in a fair, just, honest, and equitable
15   manner.  The Individual Defendants were and are required to act in furtherance of the
16   best interests of Matrixx and its shareholders so as to benefit all shareholders equally and
17   not in furtherance of their personal interest or benefit.

18          26.     Each director and officer of the Company owes to Matrixx and its
19   shareholders the fiduciary duty to exercise good faith and diligence in the administration
20   of the affairs of the Company and in the use and preservation of its property and assets,
21   and the highest obligations of fair dealing.  In addition, as officers and/or directors of a
22   publicly held company, the Individual Defendants had a duty to promptly disseminate
23   accurate and truthful information with regard to the Company's operations, performance,
24   management, projections, and forecasts so that the market price of the Company's stock
25   would be based on truthful and accurate information.

26          27.     The Individual Defendants, because of their positions of control and
27   authority as directors and/or officers of Matrixx, were able to and did, directly and/or
28   indirectly, exercise control over the wrongful acts complained of herein, as well as the

- 8 -

contents of the various public statements issued by the Company.  Because of their advisory, executive, managerial, and directorial positions with Matrixx, each of the Individual Defendants had access to adverse non-public information about the financial condition, operations, and improper representations of Matrixx, including complaints about the Company's Intranasal Products and statutory requirements to forward complaints to the FDA.

28.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Matrixx, and was at all times acting within the course and scope of such agency.

29.    To discharge their duties, the officers and directors of Matrixx were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Matrixx were required to, among other things:

(a)     refrain from acting upon material inside corporate information to benefit themselves;

(b)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and providing truthful and accurate statements to the FDA regarding their products;

(c)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(d)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(e)     remain informed as to how Matrixx conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such

1  conditions or practices and make such disclosures as necessary to comply with securities

2  laws; and

3         (f)    ensure that the Company was operated in a diligent, honest, and

4  prudent manner in compliance with all applicable laws, rules, and regulations.

5       30.    Each Individual Defendant, by virtue of his or her position as a director

6  and/or officer, owed to the Company and to its shareholders the fiduciary duties of

7  loyalty, good faith and the exercise of due care and diligence in the management and

8  administration of the affairs of the Company, as well as in the use and preservation of its

9  property and assets.  The conduct of the Individual Defendants complained of herein

10  involves a knowing and culpable violation of their obligations as directors and officers of

11  Matrixx, the absence of good faith on their part, and a reckless disregard for their duties

12  to the Company and its shareholders that the Individual Defendants were aware or should

13  have been aware posed a risk of serious injury to the Company.  The conduct of the

14  Individual Defendants who were also officers and/or directors of the Company during the

15  Relevant Period have been ratified by the remaining Individual Defendants who were

16  also on Matrixx's Board during the Relevant Period.

17       31.    The Individual Defendants breached their duties of loyalty and good faith

18  by allowing defendants to cause, or by themselves causing, the Company to misrepresent

19  its Intranasal Product issues, as detailed herein below, and by failing to prevent the

20  Individual Defendants from taking such illegal actions.  In addition, as a result of

21  defendants' illegal actions and course of conduct during the Relevant Period, the

22  Company is now the subject of a class action lawsuit that alleges violations of securities

23  laws.  As a result, Matrixx has expended, and will continue to expend, significant sums of

24  money.

25  **Matrixx's Code of Ethics**

26       32.    The Company's Board had a duty to closely monitor the Company's

27  compliance with the FDA regulations under the Company's Code of Ethics.  The

28  Company's Code of Ethics states:

The directors, officers and employees of Matrixx and any professional advisors of Matrixx, while they are engaged to work for or on behalf of the Company, (all of whom may sometimes be referred to herein as "Members" of the Company) must at all times conduct themselves and their activities on behalf of the Company with uncompromising honesty and integrity. Business ethics are no different from personal ethics. Members of Matrixx are expected to adhere to the highest ethical standards regardless of personal interests, industry customs or the demands of others. They are expected to be honest and forthright in dealing with each other and with the Company's customers, vendors, advisors and other third parties. This approach should be consistent and habitual. Doing the right thing means doing it right every time. Matrixx's philosophy is that the Company's business practices should be compatible with the commercial, economic and social priorities of any locale in which it operates. While the style of commercial dealings may vary among certain industries and in different cultures, we believe that honesty and integrity must always characterize our business activity and will never be the subject of criticism.

Every Member of the Matrixx family, whether he or she works for us within the Company or with us as an outside advisor, is at all times expected to:

- act with honesty and integrity, avoiding actual or apparent conflicts of interest between personal and professional relationships, and, in cases where an actual or apparent conflict of interest arises, taking appropriate and timely action to notify management of such conflict and to remove him or herself from the situation that gives rise to the conflict;

- comply with all applicable laws, regulations and rules of federal, state, local and foreign governments and regulatory authorities;

- ensure that information provided in the Company's periodic reports filed with the SEC and in other public communications is accurate, complete, fair, objective, relevant, timely and understandable;

- act responsibly and in good faith in the execution of his or her duties, with due care, competence and diligence, without misrepresenting material facts or allowing one's independent judgment to be compromised;

- respect applicable obligations of confidentiality when dealing with Company or third party information in the course of one's work, and not use any such information for personal advantage or gain;

- proactively promote ethical behavior as a responsible partner among peers in the workplace, including promptly reporting to appropriate persons within the Company any actual or suspected violation of this Code of Ethics (see "Reporting Ethical Violations" below); and

- make responsible use of the Company's assets and resources.

As explained herein, Matrixx's Board failed to make sure the Company "compl[ied] with all applicable laws, regulations and rules of federal, state, local and foreign governments and regulatory authorities" and therefore, the Board breached their fiduciary duties to Matrixx.

**Matrixx's Audit Committee Charter**

33.     Matrixx's Audit Committee Charter states:

[T]he Audit Committee serves to assist the Board in its oversight of (1) the integrity of the Company's financial statements and financial reporting, (2) the Company's compliance with legal and regulatory requirement, (3) the qualifications and independence of the company's independent auditor, (4) the performance of the Company's internal reporting and audit functions, and (5) the Company's disclosure controls and procedures and system of internal controls regarding finance, accounting, legal compliance and ethics.

Under Matrixx's Audit Committee Charter, the Audit Committee members had a duty to comply with all legal and regulatory requirements, including federal legislation and FDA regulations.

**Matrixx's Compensation Committee Charter**

34.     Under Matrixx's Compensation Committee Charter, the Compensation Committee members were required to review the "performance of the Company's executive management in achieving corporate goals and objectives and seeks to ensure that executive management members are compensated appropriately."

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

35.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or

design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

36. During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did: (i) conceal the fact that the Company was receiving complaints regarding serious adverse events from consumers; (ii) conceal the fact that the Company was putting inadequate warnings on its product; (iii) enhance the Individual Defendants' executive and directorial positions at Matrixx and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions; and (iv) deceive the investing public, including shareholders of Matrixx, regarding the Individual Defendants' management of Matrixx's operations, the Company's financial health and stability, and its future business prospects that had been misrepresented by defendants throughout the Relevant Period. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

37. The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct during the Relevant Period. During this time, the Individual Defendants caused the Company to conceal the true fact that Matrixx's Intranasal Product issues were in violation of the FDA requirements

38. The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment; and to conceal adverse information concerning the Company's operations, financial condition, and future business prospects; and to facilitate their sale of over $3.4 million of their personally held shares.

39. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly, or negligently release improper statements. Because the actions described

1  herein occurred under the authority of the Board, each of the Individual Defendants was a

2  direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or

3  common course of conduct complained of herein.

4       40.   Each of the Individual Defendants aided and abetted and rendered

5  substantial assistance in the wrongs complained of herein.  In taking such actions to

6  substantially assist the commission of the wrongdoing complained of herein, each

7  Individual Defendant acted with knowledge of the primary wrongdoing, substantially

8  assisted the accomplishment of that wrongdoing, and was aware of his or her overall

9  contribution to and furtherance of the wrongdoing.

10  **FACTUAL ALLEGATIONS**

11       41.   Matrixx engages in the development, production, marketing, and sale of

12  OTC healthcare products.  Matrixx's revenue is primarily generated from the Company's

13  line of Zicam products.  The Intranasal Products are produced, marketed, and sold by

14  Zicam a wholly owned subsidiary of Matrixx.  Zicam Cold Remedy Nasal Gel was

15  introduced in 1999.  In 2002, the Company introduced Zicam Code Remedy Gel Swabs.

16  **Controversy of Anosmia and Personal Injury Litigation:**

17       42.   The Intranasal Products contain zinc gluconate, which the Company claims

18  shortens and prevents the duration of the common cold.

19       43.   Although The Intranasal Products are sold OTC, the FDA has stated that

20  the Intranasal Products may cause anosmia.  Nowhere on the Intranasal Products does

21  Zicam warn of anosmia.  Anosmia is the brief or permanent loss of smell.  Shortly after

22  the introduction of Intranasal Products, consumer complaints were sent to the Company

23  and the FDA following the use of the Intranasal Products.

24       44.   On January 19, 2006, Matrixx agreed to pay $12 million to settle a

25  consolidated product liability lawsuit in Arizona, alleging that its Zicam Cold Remedy

26  caused anosmia.  In addition to this consolidated suit, there are dozens of other personal

27  injury and product liability suits related to the Intranasal Products manufactured and sold

28  by Zicam.  According to a Form 10-K filed with the SEC on June 8, 2009, the Company

- 14 -

stated "[f]or fiscal 2010, we estimate our legal expenses for product liability defense will be approximately $300,000 to $500,000 per quarter. We do not expect any significant reimbursements from our insurance carriers for legal expenses incurred in fiscal 2010 or any future periods."

45.     Throughout the Relevant Period, the Individual Defendants caused Matrixx to embark on a massive marketing and advertising campaign directed at consumers, including ones specifically designed for and marketed to children.     However, unbeknownst to consumers and the investing public, the Individual Defendants caused Matrixx to issue false and misleading statements concerning the safety of Intranasal Products by failing to adequately disclose the significant risk of anosmia associated with the drug.     The Individual Defendants ignored numerous warnings concerning the considerable anosmia risk surrounding the Intranasal Products and also failed to report complaints received by the Company.

46.     Despite the Individual Defendants wealth of knowledge about anosmia being linked to the use of zinc, the Individual Defendants deliberately ignored such information and continued to allow the Intranasal Products to be sold over-the-counter without adequately warning consumers of the risk of anosmia.

**DEFENDANTS' WRONGDOING:  GOVERNMENT INVESTIGATIONS**

**FDA Inspection:**

47.     From May 26, 2009 through May 28, 2009, an inspector with the FDA performed an initial inspection of the Matrixx facilities.  The contents of the inspection are in the "Establishment Inspection Report" (the "Report").  In the Report, the inspector uncovered that the Company had received numerous complaints about anosmia that were never reported to the FDA by Matrixx as they should have been under the Dietary Supplement and Nonprescription Drug Consumer Protection Act (the "Act").  The Act requires that companies involved in the manufacture of non-prescription drugs and dietary supplements report "serious adverse events" to the FDA.  A serious adverse event is defined in the Act as "an adverse event that (A) results in—(i) death; (ii) a life-

threatening experience; (iii) inpatient hospitalization; (iv) **a persistent or significant disability or incapacity**; or (v) a congenital anomaly or birth defect." (Emphasis added) As noted in the FDA's June 16, 2009 Warning Letter, the FDA states the short-term or permanent loss of smell "can have serious consequences. For example, patients with anosmia may not be able to detect the smell of a gas leak, smoke, or spoiled food. Loss of sense of taste can have a major impact on an individual's quality of life." In the Report, under the heading "OBJECTIONABLE CONDITIONS AND MANAGEMENT RESPONSE," the FDA inspector noted "that written procedures describing the handling of complaints are not followed."

48. As a result of the Act, Matrixx should have been reporting every complaint of anosmia they received to the FDA. However, the FDA did not receive any complaints directly from the Company, but the FDA did receive 130 reports of anosmia directly from consumers regarding the Intranasal Products. In filings made with the SEC, however, Matrixx represented that it was in compliance with FDA regulations. For example, in the Company's Form 10-K filed with the SEC on June 8, 2009, the Individual Defendants caused the Company to state:

> We are subject to various federal, state and local laws and regulations that affect our business. All of our products are subject to regulation by the FDA, including regulations with respect to manufacturing processes and procedures, ingredients in the products, labeling and claims made. Our drug products are commercially distributed by following the Homeopathic Pharmacopeia or FDA's OTC monographs. The OTC monographs classify certain drug ingredients as safe and effective for specified uses and establish categorical requirements for the marketing of drugs containing such ingredients without pre-approval. All of our Zicam Cold Remedy, Zicam Allergy Relief, and Zicam Cold Sore products are subject to the requirements of the Homeopathic Pharmacopeia of the United States. Zicam Extreme Congestion Relief, Zicam Sinus Relief, the Zicam cough product, and the Zicam multi-symptom relief products are subject to the requirements of the FDA as allopathic drugs. All of our claims and advertising are subject to the rules of the Federal Trade Commission (FTC). **Although we believe that our products and claims comply in all material respects with the regulatory requirements,** if the FDA or FTC were to determine that we are in violation of any such requirement, either agency

- 16 -

could restrict our ability to market the products, require us to change the claims that we make or cause us to remove the products from the market.

**FDA Warning Letter:**

49.   On June 16, 2009, Zicam received a Warning Letter from the FDA regarding the Intranasal Products.  The Warning Letter in part stated:

> This letter concerns your firm's marketing of the products Zicam Cold Remedy Nasal Gel, Zicam Cold Remedy Gel Swabs, and Zicam Cold Remedy Swabs, Kids Size.

> FDA has concluded that these products may pose a serious risk to consumers who use them.  Specifically, FDA has received more than 130 reports of anosmia, (loss of sense of smell, which in some cases can be long-lasting or permanent), associated with use of these products.

> To protect consumers, and in light of the violations described below, we ask that within fifteen working days of receipt of this letter, you notify this office in writing of the specific steps that you have taken to correct the violations.

> *        *        *

> Under sections 301(d) and 505(a) of the Act, 21 U.S.C. §§ 331(d) and 355(a), a new drug may not be introduced or delivered for introduction into interstate commerce unless an FDA   approved application is in effect for it.  There are no approved new drug applications (NDAs) on file with FDA for any of the Zicam Cold Remedy intranasal products; you market them without FDA approval.

> We recognize that the labeling for Zicam Cold Remedy intranasal products identifies them as homeopathic drug products with an active ingredient measured in homeopathic strength—Zincum Gluconicum 2X. Nothing in the Act or the regulations issued under it exempts homeopathic drugs from the new drug approval requirements.  We acknowledge that many homeopathic drug products are manufactured and distributed without FDA approval under enforcement policies set out in the FDA's Compliance Policy Guide entitled, "Conditions Under Which Homeopathic Drugs May be Marketed (CPG 7132.15)" (the CPG).  The enforcement discretion set forth in the CPG is not unlimited, however.  The CPG states that it "delineates those conditions under which homeopathic drugs may ordinarily be marketed in the U.S." (emphasis added)   The qualifying word "ordinarily" indicates that the CPG specifically contemplates that there may be circumstances where a product that otherwise may meet the conditions set forth in the CPG may nevertheless be subject to enforcement action.

A significant and growing body of evidence substantiates that the Zicam Cold Remedy intranasal products may pose a serious risk to consumers who use them. Specifically, FDA has received more than 130 reports of anosmia (loss of sense of smell, which in some cases can be long-lasting or permanent),associated with use of these products; some individuals also report loss of sense of taste.[2] By comparison, FDA has received few reports of anosmia associated with other widely-used intranasal products for treatment of the common cold that are marketed subject to approved NDAs or according to an OTC drug monograph. Further, there is evidence in the published scientific literature that various salts of zinc can damage olfactory function in animals and humans.

50.     On release of the news of the FDA Warning Letter, Matrixx's value dropped 70%.

51.     Additionally, on June 19, 2009, Matrixx received an informal inquiry from the SEC requesting certain documents regarding the FDA's Warning Letter issued to the Company.

## IMPROPER STATEMENTS

52.     Throughout the Relevant Period, Matrixx under the Individual Defendants' direction issued public statements that improperly misled the Company's shareholders regarding the Intranasal Products' link to anosmia. Defendants Cowley, Bush, Clayton, Egan, and Matthews directly participated in these improper statements as alleged below. Moreover, defendants Cowley, Bush, Clayton, Egan, and Matthews as members of the Audit Committee were specifically charged with reviewing the improper earnings press releases and other disclosure controls and procedures. The statements contained herein were either falsified or the Company failed to properly disclose the risks of anosmia.

53.     As early as 1999, the FDA received reports of anosmia caused by Matrixx's products. However, the Individual Defendants have caused the Company to make numerous statements denying the link. For example, on February 6, 2004, the Individual Defendants caused the Company to issue a press release that stated:

Matrixx Initiatives, Inc., the manufacturer of Zicam(R) Cold Remedy zinc products, said today that reports alleging anosmia -- or loss of smell -- in a small number of patients using zinc gluconate intranasal gels for the

treatment of the common cold are completely unfounded and misleading. At this time, the company is not aware of any investigation by a regulatory body with regard to the product.

We want to assure our consumers that Zicam Cold Remedy intranasal zinc gluconate products are manufactured and marketed according to Food and Drug Administration guidelines for homeopathic medicine. Our primary concerns are the health and safety of those who use Zicam Cold Remedy nasal gels and the distribution of factual information about our products.

In no clinical trial of intranasal zinc gluconate gel products has there been a single report of lost or diminished olfactory function (sense of smell). Rather, the safety and efficacy of zinc gluconate for the treatment of symptoms related to the common cold have been well established in two double-blind, placebo-controlled, randomized clinical trials. In fact, in neither study were there any reports of anosmia related to the use of this compound. The overall incidence of adverse events associated with zinc gluconate was extremely low, with no statistically significant difference between the adverse event rates for the treated and placebo subsets.

A multitude of environmental and biologic influences are known to affect the sense of smell. Chief among them is the common cold. As a result, the population most likely to use cold remedy products is already at increased risk of developing anosmia. Other common causes of olfactory dysfunction include age, nasal and sinus infections, head trauma, anatomical obstructions, and environmental irritants.

***Zinc and Loss of Smell Research***

*A few researchers have attempted to link nasal products containing zinc to the onset of anosmia. However, this hypothesis is based on data from polio studies conducted in the 1930s using a concentrated zinc sulfate solution. Current nasal products, such as Zicam Cold Remedy, contain zinc gluconate, which is an entirely different compound.*

Zinc sulfate is a mineral salt that reacts with water to produce a strong acid (sulfuric acid) and zinc oxide, which is practically insoluble in water. By comparison, zinc gluconate is a weak organic salt that dissolves to form positively charged zinc ions and negatively charged gluconate-a naturally occurring, non-toxic compound found in all human tissues. Zicam Cold Remedy is a buffered gel, formulated to have a neutral pH-i.e., a pH that approximates that of the nasal cavity.

54.     On April 28, 2004, the Individual Defendants caused the Company to once again deny the link between the Intranasal Products and anosmia and claimed it was an attempt to devalue the Company's stock:

> Matrixx Initiatives, Inc., maker of Zicam(R) Cold Remedy and other products, today reported triple-digit earnings growth for the First Quarter 2004 -- versus the same period in 2003 -- during its annual meeting of shareholders. Matrixx achieved these results despite what the company believes is an apparent attempt by some in the financial industry to unfairly attack the company's products and devalue its stock.
>
> ***During the annual shareholders' meeting, company executives discussed the most recent attacks, which began with a poster presentation by Bruce Jafek, MD, Rocky Mountain Taste and Smell Center at the University of Colorado Medical Center, attempting to link intranasal zinc gluconate gel-the active ingredient in Zicam Cold Remedy nasal gels-to anosmia (loss of smell). The poster was presented at a conference of the American Rhinologic Society (ARS) in September 2003. These attacks have included false and defamatory Internet postings as well as product liability litigation that focuses on the alleged link between Zicam Cold Remedy and anosmia, as described in the poster presentation.***
>
> "When we first learned of the poster presentation, we became suspicious," said Carl J. Johnson, President and Chief Executive Officer of Matrixx Initiatives, Inc. "The presentation appeared to be very unscientific, relying on a weak anecdotal case study of one patient with multiple risk factors for loss of smell. The conclusions were not supported by medical literature or the company's peer-reviewed clinical studies. In addition, the conclusions were based on studies with zinc sulfate, a completely different compound than zinc gluconate."
>
> Matrixx recently discovered that Dr. Jafek's son "sold short" shares of the company's stock just before the presentation. Those transactions would result in a significant financial gain if the company's stock price dropped following the presentation. At the time, his son was employed in the investment community.
>
> ***"We wondered why a physician would present data using such scientifically inappropriate protocols and could arrive at such unsubstantiated conclusions based on two completely different substances," said Johnson. "Loss of smell due to intranasal zinc gluconate had never been reported in any clinical research, nor were any cases of loss of smell observed in two Matrixx- sponsored peer-reviewed clinical trials with Zicam nasal gel."***

- 20 -

*Following a review of the allegations, Matrixx Initiatives, Inc., assembled an advisory panel of recognized scientific and medical experts to discuss clinical research regarding loss of smell.*

*"The panel was very critical of the poster presentation and generally felt that there was insufficient evidence to conclude that loss of smell could be attributed to zinc gluconate, the active ingredient in Zicam Cold Remedy intranasal gel," said Johnson. "The chairman of the scientific advisory panel forwarded a letter to the ARS citing various inadequacies with the poster presentation."*

According to Johnson, Matrixx takes these attempts, as well as reports of loss of smell, very seriously.

"Matrixx' primary concern is the health and well-being of the consumers who use our products. We fully intend to continue our investigation and take appropriate action where justified," said Johnson.

55.   In a Form 10-Q filed on November 7, 2007, the Company stated that "Zicam Cold Remedy nasal gel does not cause loss of smell and that claims to the contrary are scientifically unfounded and misleading."  This statement was also made in 10-Qs filed on February 7, 2008, August 7, 2008, November 6, 2008, and February 6, 2009.  Additionally, on June 13, 2008, the Company filed a 10-K with the same language.

56.   On May 12, 2008, the Individual Defendants caused Matrixx to issue a press release announcing its financial results for the fiscal quarter and year ended March 31, 2008.  In the press release, defendant Hemelt claimed anosmia was not related to the Intranasal Products as follows:

"We continue to make progress on the product liability front. In April, we reported on a unanimous jury decision in favor of the Company in a trial in California. Together with the eight favorable Daubert decisions, we have now established a strong legal record that affirms our position that allegations linking Zicam Cold Remedy to anosmia lack scientific foundation. Although we incurred higher legal expense for the recent trial, product liability defense costs decreased to $2.5 million (net of $560,000 for insurance reimbursements) for the year ended March 31, 2008, compared to $4.1 million for the twelve months ended March 31, 2007 (net of $1.6 million for insurance reimbursements)."

**The Compensation Committee Approves New Executive Compensation Agreements**

57.   The Company and shareholders have suffered due to the Intranasal Products recall, but Matrixx's executive officers have not.   Matrixx's Compensation Committee has instituted new compensation agreements for its executive officers in response to the Intranasal Products fiasco.  In a Form 8-K filed on September 10, 2009, the Individual Defendants caused the Company to state:

> In light of recent developments associated with the Food and Drug Administration's June 16, 2009 warning letter (the "Warning Letter") and the Company's voluntary withdrawal of Zicam Cold Remedy Swabs and Zicam Cold Remedy Nasal Gel products (see the Company's Reports on Form 8-K filed with the SEC on June 16, 17, 19 and 23, July 2 and September 2, 2009), the Compensation Committee determined that the 2010 Plan no longer functions as an effective retention or incentive program. As a result, on September 3, 2009 the Compensation Committee terminated the 2010 Plan and approved a new 2010 Plan (the "New 2010 Plan") for the Company's executive officers, including the following "named executive officers" included in the Company's proxy statement relating to its August 26, 2009 annual meeting of shareholders (the "Named Executive Officers"): William J. Hemelt; Samuel C. Cowley; Timothy L. Clarot; and James Marini.

> Like the 2010 Plan, the New 2010 Plan includes retention and incentive components and the ***award opportunities under each Plan are of equal value***; however, awards under the New 2010 Plan will be payable solely in cash (versus cash and restricted stock under the 2010 Plan). Each component of the New 2010 Plan is described below.

58.   Although the Company's revenue has deteriorated due to the Intranasal Products being recalled, the executive officers will still receive the same bonuses as they would have before the recall.   Less revenue and lack of oversight equals the same bonuses for Matrixx executives.

## THE IMPROPER BUYBACK

59.   During the Relevant Period, while Matrixx's stock was artificially inflated due to lack of compliance with FDA regulations and the Act, the Director Defendants authorized the buyback of over $14.5 million worth of Matrixx's shares at an average price of approximately $15.13 per share. This is substantially higher than Matrixx's share price when its true business health was revealed, dropping Matrixx's stock to $5.78.  The

1  Individual Defendants therefore caused Matrixx to waste millions of dollars in the stock

2  repurchase.

3                                    **INSIDER SALES**

4        60.    During the Relevant Period, the Insider Selling Defendants made the

5  following sales of their personally held Matrixx stock while in possession of material

6  non-public information regarding the Company's Intranasal Product issues.

| Insider Last Name | Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| **BUSH** | 9/22/2008 | 10,000 | $18.05 | $180,500.00 |
| | 2/6/2009 | 4,000 | $18.15 | $72,600.00 |
| | | 14,000 | | $253,100.00 |
| | | | | |
| **CLAROT** | 2/7/2008 | 971 | $12.81 | $12,438.51 |
| | 3/31/2008 | 2,090 | $14.64 | $30,597.60 |
| | 2/9/2009 | 1,466 | $18.29 | $26,813.14 |
| | 2/17/2009 | 25,000 | $18.62 | $465,500.00 |
| | 2/23/2009 | 700 | $18.50 | $12,950.00 |
| | 3/31/2009 | 3,063 | $16.40 | $50,233.20 |
| | 5/8/2009 | 2,617 | $16.45 | $43,049.65 |
| | 5/12/2009 | 50,000 | $18.50 | $925,000.00 |
| | 6/5/2009 | 6,902 | $19.50 | $134,589.00 |
| | 6/8/2009 | 2,414 | $19.54 | $47,169.56 |
| | 6/9/2009 | 3,360 | $19.55 | $65,688.00 |
| | 6/10/2009 | 7,324 | $19.63 | $143,770.12 |
| | | 105,907 | | $1,957,798.78 |
| | | | | |
| **COWLEY** | 5/8/2009 | 2,699 | $16.45 | $44,398.55 |
| | 5/8/2009 | 5,860 | $14.27 | $83,622.20 |
| | | 8,559 | | $128,020.75 |
| | | | | |
| **HEMELT** | 2/7/2008 | 1,149 | $12.81 | $14,718.69 |
| | 3/31/2008 | 2,324 | $14.64 | $34,023.36 |
| | 2/9/2009 | 2,425 | $18.29 | $44,353.25 |
| | 2/18/2009 | 7,223 | $19.44 | $140,415.12 |
| | 2/19/2009 | 1,572 | $19.44 | $30,559.68 |
| | 3/31/2009 | 3,776 | $16.40 | $61,926.40 |
| | 5/8/2009 | 3,255 | $16.45 | $53,544.75 |
| | | 21,724 | | $379,541.25 |
| | | | | |
| **JOHNSON** | 2/7/2008 | 4,620 | $12.81 | $59,182.20 |

| | | | | |
|---|---|---|---|---|
| | 3/31/2008 | 5,755 | $14.64 | $84,253.20 |
| | | 10,375 | | $143,435.40 |
| **MARINI** | 3/31/2008 | 1,720 | $14.64 | $25,180.80 |
| | 8/19/2008 | 10,000 | $17.08 | $170,800.00 |
| | 9/22/2008 | 7,016 | $18.13 | $127,200.08 |
| | 9/24/2008 | 2,984 | $18.13 | $54,099.92 |
| | 2/9/2009 | 1,090 | $18.29 | $19,936.10 |
| | 2/19/2009 | 700 | $19.50 | $13,650.00 |
| | 3/31/2009 | 1,454 | $16.40 | $23,845.60 |
| | 5/8/2009 | 1,677 | $16.45 | $27,586.65 |
| | 6/10/2009 | 1,300 | $19.73 | $25,649.00 |
| | 6/11/2009 | 4,000 | $19.73 | $78,920.00 |
| | | 31,941 | | $566,868.15 |
| **TOTAL:** | | 192,506 | | $3,428,764.33 |

**DAMAGES TO MATRIXX CAUSED BY THE INDIVIDUAL DEFENDANTS**

61.     As a result of the market learning of the Warning Letter, Matrixx shares fell as much as 70% following the announcement.  According to the Wall Street Journal in a June 17, 2009 article, "[t]he Zicam intranasal products affected by the FDA's move account for about 40% of the company's sales, which totaled about $112 million for its fiscal year ended March 31."  In reaction to the FDA's Warning Letter, the Company pulled Zicam's Intranasal Products off the shelves.  Furthermore, the Company stated in a June 18, 2009 Conference Call that pulling the product from the shelves would cost the Company $10 million.

62.     As a result of the Individual Defendants' improprieties, Matrixx disseminated improper statements that concealed numerous complaints concerning the Intranasal Products' link to anosmia.  These improper statements have devastated Matrixx's credibility as reflected by the Company's $126 million or 70% market capitalization loss.

63.     Further, as a direct and proximate result of the Individual Defendants' action, Matrixx has expended and will continue to expend significant sums of money.  Such expenditures include, but are not limited to:

      (a)    Costs incurred from the $12 million in damages to settle only some of the personal injury and product liability suits against the Company;

      (b)    costs incurred in defending Matrixx against future and current personal injury and product liability lawsuits;

      (c)    costs incurred in investigating and defending Matrixx and certain officers in a securities fraud class action lawsuit, plus potentially tens of millions of dollars in settlement or to satisfy an adverse judgment;

      (d)    costs associated with FDA Warning Letter and future compliance with FDA requirements;

      (e)    costs associated with having Zicam's Intranasal Products approved under the FDA new drug application approval process;

      (f)    costs incurred in connection with the SEC informal inquiry;

      (g)    costs incurred from compensation and benefits paid to the Individual Defendants who have breached their duties to Matrixx;

      (h)    costs incurred with approving the new executive officer compensation plan;

      (i)    costs incurred in connection with the recall of Zicam's Intranasal Products  and paying retailers for clearing the product from store shelves which has totaled at least $10 million already; and

      (j)    costs incurred by the Company for overpaying for its own stock as a result of the defendants' breaches of their fiduciary duty.

64.    Moreover, these actions have irreparably damaged Matrixx's corporate image and goodwill.  For at least the foreseeable future, Matrixx will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Matrixx's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

65.    Plaintiff brings this action derivatively in the right and for the benefit of Matrixx to redress injuries suffered, and to be suffered, by Matrixx as a direct result of breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  Matrixx is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

66.    Plaintiff is and was a shareholder of Matrixx at the time of the events and transactions complained of herein.

67.    The Board consists of the following seven defendants:  Hemelt, Cowley, Bush, Clayton, Egan, Matthews, and Zeher.

68.    In their positions as Board members, Hemelt, Cowley, Bush, Clayton, Egan, Matthews, and Zeher were (or should have been) well aware of the past research and issues with zinc gluconate because it was main ingredient in the Company's Cold Remedy Line, of products which represented 71% of sales in Fiscal Year 2009, 68% of sales in Fiscal Year 2008, and 72% of sales in Fiscal Year 2006.  The Intranasal Products were the Company's largest selling products accounting for as much as 40% of the Company's revenue.    Furthermore, when the Act went into effect, the Director Defendants should have been aware that serious adverse events caused by their flagship product could put the Company in jeopardy.  An unfavorable action by the FDA against the Intransal Products could (and did) cause a calamitous result for the Company. Therefore the Board knew Matrixx needed to properly comply with the Act and FDA regulations regarding non-prescription drugs.  Based on this reality, demand is futile for at least the following reasons:

69.    The Board should have been aware of the serious adverse events being caused by the Company's Intranasal Products due to the massive amount of complaints received by the Company and the history of the intranasal use of zinc causing anosmia. In a June 16, 2009 media briefing by the FDA, Dr. Charles Lee, Medical Officer in the Office of Compliance at the FDA's Center for Drug Evaluation and Research, stated

1   "[h]istorical information from back in the 1930's where zinc was used in an attempt to

2   prevent polio infection as well as case reports from the medical literature with use of zinc

3   containing intranasal products causing insomnia."   Furthermore, at the same media

4   briefing Deb Autor, the Director of the Office of Compliance at FDA's Center for Drug

5   Evaluation and Research stated "the company has done trial involving a small number of

6   patients, exposing them to intranasal zinc containing Zicam products.  We believe there

7   [were] not…enough patients exposed in those trial to detect infrequent but serious

8   adverse affects." The Individual Defendants knew or should have known that anosmia

9   could be caused by the intranasal use of zinc.  Accordingly, these defendants face a

10  substantial likelihood of liability for breach of their fiduciary duties of loyalty and good

11  faith.  Any demand upon these defendants is therefore futile.

12      70.     During the Relevant Period, defendants Bush, Clayton, Egan, Matthews,

13  and Cowley, as members of the Audit Committee, were responsible under Matrixx's

14  charter in effect for the Company's compliance with legal and regulatory requirements,

15  including FDA requirements and the Act.  As a direct result of the lack of compliance

16  with the Act, the Company has been the subject of an FDA Warning Letter and has had to

17  recall the Intranasal Products which cost the Company at least $10 million to perform the

18  recall alone.  Accordingly, these defendants face a substantial likelihood of liability for

19  breach of their fiduciary duties of loyalty and good faith.  Any demand is therefore futile

20  as to defendants Bush, Clayton, Egan, Matthews, and Cowley for failing to comply with

21  the Audit Committee Charter.

22      71.     Also during the Relevant Period, defendants Bush, Clayton, Egan,

23  Matthews, and Cowley, as members of the Audit Committee, were responsible under

24  Matrixx's charter in effect for reviewing the disclosure and content of Matrixx's earnings

25  press releases.   Those press releases contained critical disclosures regarding the

26  Company's increased revenues for their Intranasal Products. The press releases also

27  contained false and misleading information regarding the Company's compliance with

28  FDA regulations and the Intranasal Products link to anosmia.   Accordingly, these

1  defendants face a substantial likelihood of liability for breach of their fiduciary duties of

2  loyalty and good faith.  Any demand upon these defendants is therefore futile.

3      72.    The Compensation Committee consists of Bush, Clayton, Matthews, and

4  Zeher.   The Compensation Committee has endorsed the mismanagement of Zicam.

5  Bush, Clayton, Matthews, and Zeher have all breached their fiduciary obligations of trust,

6  loyalty, good faith, and due care by approving compensation that is unwarranted

7  considering the executives officers failure to report severe adverse events with Zicam's

8  Intranasal Products and failure to provide adequate warnings on the product.   As

9  referenced above, as a result of the new compensation agreements, the Compensation

10 Committee members can not reasonably be expected to consider a demand because their

11 response to the wrongdoing was to endorse the executive mismanagement by favorably

12 amending management compensation agreements.

13     73.    Defendants Hemelt, Cowley, Bush, Clayton, Egan, Matthews, and Zeher

14 are responsible for violation of the Company's Code of Ethics by not being "honest and

15 forthright" and failing to "comply with all applicable laws, regulations and rules of

16 federal, state, local and foreign governments and regulatory authorities."  In particular,

17 Hemelt, Cowley, Bush, Clayton, Egan, Matthews, and Zeher have failed to comply with

18 the Act as described above and failed to have the Company implement adequate warning

19 labels on Zicam's Intranasal Products.  Accordingly, these defendants face a substantial

20 likelihood of liability for breach of their fiduciary duties of loyalty and good faith.  Any

21 demand upon these defendants is therefore futile.

22     74.    Defendants Cowley, Bush, Clayton, Egan, Matthews, and Zeher, as

23 members of the Board during the Relevant Period, authorized the repurchases of more

24 than $14 million worth of the Company's shares at artificially inflated prices.  Defendants

25 Cowley, Bush, Clayton, Egan, Matthews, and Zeher's decision to authorize the stock

26 repurchases was not the product of valid business judgment. Further, defendants Bush,

27 Cowley, Hemelt and Johnson engaged in self-dealing in that they sold their personally-

28 held shares while directing the Company to buy shares.  Therefore, there is a reasonable

doubt as to whether defendants were interested or independent. Accordingly, demand was futile.

75.     During the Relevant Period, defendants Bush, Cowley, Hemelt, and Johnson sold Matrixx stock under highly suspicious circumstances as alleged above. Accordingly, these defendants face a substantial likelihood of liability for breach of their fiduciary duty of loyalty. Any demand upon these defendants is therefore futile.

76.     The principal professional occupation of defendant Hemelt is his employment with Matrixx as its President, CEO, and director, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits. Thus, a reasonable doubt is raised that defendant Hemelt lacks independence, rendering him incapable of impartially considering a demand to commence and vigorously prosecute this action.

77.     Plaintiff has not made any demand on shareholders of Matrixx to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a)     Matrixx is a publicly held company with over 9 million shares outstanding, and thousands of shareholders;

(b)     making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses, or phone numbers of shareholders; and

(c)     making demand on all shareholders would force plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

## COUNT I

**Derivatively Against the Director Defendants and Officer Defendants for Violation of §10(b) and Rule 10b-5 of the Exchange Act**

78.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

79.     During the Relevant Period, the Director Defendants and Officer

Defendants disseminated or approved public statements that failed to disclose the risk of anosmia and failed to disclose complaints of serious adverse events to the FDA. The Director Defendants and Officer Defendants knew that the Company's public statements concerning its FDA compliance were misleading and intended to deceive, manipulate, and/or defraud in connection therewith. Thus, the shares were artificially inflated due to the revenue created by the Intranasal Products that would not have otherwise been created, but for the deception of the Directors Defendants and Officer Defendants.

80.     The Insider Selling Defendants sold over $3 million worth of shares of Matrixx common stock at inflated prices during the Relevant Period while in possession of material non-public information. These defendants misappropriated Matrixx's proprietary information and violated their so-called "abstain or disclose" duties under the federal securities laws when they sold Matrixx stock without disclosing the information alleged to have been concealed herein.

81.     At the same time the price of the Company's common stock was inflated due to the lack of disclosure of serious adverse events to the FDA, and the Insider Selling Defendants were selling stock into the market, the Director Defendants and Officer Defendants were causing Matrixx to repurchase over $14 million worth of its own stock on the open market at an average inflated price.

82.     As such, the Director Defendants and Officer Defendants violated §10(b) of the Exchange Act and SEC Rule 10b-5 in that they:

(a)     employed devices, schemes, and artifices to defraud;

(b)     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Matrixx and others in connection with their purchases of Matrixx common stock during the Relevant Period.

83.     As a result of the Director Defendants' and Officer Defendants' misconduct,

- 30 -

Matrixx has and will suffer damages in that it paid artificially inflated prices for Matrixx common stock purchased on the open market. Matrixx would not have purchased Matrixx common stock at the prices it paid, had the market previously been aware that the market price of Matrixx's stock was artificially and falsely inflated by the misleading statements. As a direct and proximate result of the wrongful conduct of the Director Defendants and Officer Defendants, Matrixx suffered damages in connection with its purchases of Matrixx common stock during the Relevant Period. By reason of such conduct, the Director Defendants and Officer Defendants are liable to the Company pursuant to §10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

## COUNT II

**Against the Officer Defendants and the Insider Selling Defendants for Breach of Fiduciary Duties of Due Care, Loyalty, and Good Faith**

84.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

85.     The Officer Defendants and the Insider Selling Defendants owed and owe Matrixx fiduciary obligations. By reason of their fiduciary relationships, the Officer Defendants and Insider Selling Defendants owed and owe Matrixx the highest obligation of good faith, fair dealing, loyalty, and due care.

86.     The Officer Defendants and Insider Selling Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith, and supervision. In particular, the Officer Defendants and Insider Selling Defendants breached fiduciary duties owed to Matrixx by failing to disclose reports of ansomia caused by Zicam's Intranasal Products to the FDA and shareholders.

87.     In addition, each of the Officer Defendants and Insider Selling Defendants knew or were reckless or grossly negligent in not knowing that they had caused the Company to improperly mislead the Company's shareholders as to their compliance with FDA regulations and the Act. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

- 31 -
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

88.    Defendants Hemelt, Cowley, Clarot, Marini, Bush, and Johnson sold stock during the repurchase programs which amounted to self-dealing and violations of the duty of loyalty.

89.    As a direct and proximate result of the Officer Defendants and Insider Selling Defendants failure to perform their fiduciary obligations, Matrixx has sustained significant damages.  As a result of the misconduct alleged herein, the Officer Defendants and Insider Selling Defendants are liable to the Company.

## COUNT III

**Against the Insider Selling Defendants for Breach of Fiduciary Duties for Insider Selling and Misappropriation of Information**

90.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

91.    At the time of the stock sales set forth herein, the Insider Selling Defendants knew the information described above, and sold Matrixx common stock on the basis of such information.  Namely, the Insider Selling Defendants knew the truth regarding the serious risks of anosmia.

92.    The information described above was proprietary non-public information concerning the Company's business prospects and FDA compliance.  It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold their Matrixx stock.

93.    Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

## COUNT IV

**Against All Defendants for Waste of Corporate Assets**

94.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

95.     As a result of the misconduct described above, the Individual Defendant wasted corporate assets: (i) by directing Matrixx failing to disclose and warn consumers of the risk of the Company's Intranasal Products which subjected the Company to personal injury lawsuits;  (ii) by failing to properly consider the interests of the Company and its public shareholders; (iii) by failing to conduct proper supervision; (iv) by paying bonuses to certain of its executive officers; and (v) by incurring potentially hundreds of millions of dollars of legal liability and/or legal costs to defend defendants' unlawful actions.

96.     As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

97.     Plaintiff, on behalf of Matrixx, has no adequate remedy at law.

## COUNT V

### Against All Defendants for Unjust Enrichment

98.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

99.     By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Matrixx.  The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Matrixx. Additionally, the Insider Selling Defendants were unjustly enriched as a result of their $3.4 million in insider sales.

100.     Plaintiff, as a shareholder and representative of Matrixx, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

101.     Plaintiff, on behalf of Matrixx, has no adequate remedy at law.

## COUNT VI

### Against Defendants Bush, Clayton, Matthews, and Zeher for Waste of Corporate

**Assets**

102.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

103.    As a result of the misconduct described above, defendants Bush, Clayton, Matthews, and Zeher wasted corporate assets by approving the new 2010 compensation plan in which the Company's executive officers will receive the exact same salaries and award opportunities as the old 2010 plan even though the Company has had to recall their flagship product due to breaches of fiduciary duty by the Individual Defendants.

104.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff demands judgment as follows:

A.    Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

B.    Declaring the Individual Defendants are liable under §10(b) of the Exchange Act for buying back stock of the Company at artificially inflated prices;

C.    Directing Matrixx to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Matrixx and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies:

1.    a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

- 34 -

1           2.    a provision to permit the shareholders of Matrixx to nominate at

2   least three candidates for election to the Board;

3           3.    a proposal to ensure the adequate monitoring of Matrixx's FDA

4   compliance; and

5           4.    a proposal to ensure the accuracy of information disclosed to

6   shareholders and potential shareholders regarding the Intranasal Products and other

7   products sold to consumers.

8          D.    Extraordinary equitable and/or injunctive relief as permitted by law, equity

9   and state statutory provisions sued hereunder, including attaching, impounding, imposing

10  a constructive trust on or otherwise restricting defendants' assets so as to assure that

11  plaintiff on behalf of Matrixx has an effective remedy;

12         E.    Awarding to Matrixx restitution from the defendants, and each of them, and

13  ordering disgorgement of all profits, benefits, and other compensation obtained by the

14  defendants;

15         F.    Awarding to plaintiff the costs and disbursements of the action, including

16  reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

17         G.    Granting such other and further relief as the Court deems just and proper.

18                                  **JURY DEMAND**

19     Plaintiff demands a trial by jury.

20  DATED:  September 18, 2009          WARD KEENAN & BARRETT PC

21                             MICHAEL J. KEENAN

22                             GERALD BARRETT

23

24                           *S/GERALD BARRETT*
                               GERALD BARRETT

25

26                           3838 N. Central Avenue, Suite 1720
                             Phoenix, AZ 85012

27                           Telephone: (602) 279-1717

28                           ROBBINS UMEDA LLP

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

BRIAN J. ROBBINS
GEORGE C. AGUILAR
DANIEL R. FORDE
600 B Street, Suite 1900
San Diego, CA  92101
Telephone: (619) 525-3990
Facsimile:  (619) 525-3991

KENDALL LAW GROUP, LLP
JOE KENDALL
HAMILTON LINDLEY
3232 McKinney Avenue, Suite 700
Dallas, TX 75204
Telephone: (214) 744-3000
Facsimile:  (214)744-3015

Attorneys for Plaintiff

427557_8

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT